# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

|  |  |
|---|---|
| v. | REPORT AND RECOMMENDATION |
| MICHELLE BALKUM, | 22-CR-6188-FPG-MJP |
| Defendant. | |

---

## APPEARANCES

For the United States:      AUSA Charles E. Moynihan
                            U.S. Attorney's Office - Rochester
                            100 State Street
                            Rochester, NY 14614

For the Defendant:          James P. Vacca
                            499 Kirk Road
                            Rochester, NY 14612

## INTRODUCTION

**Pedersen, M.J.**  In an indictment filed on November 29, 2022 ("Indictment") (ECF No. 57), the Grand Jury charged Michelle Balkum ("Defendant") with six counts including: (1) Narcotics Conspiracy (Count 1); (2) Possession of Heroin with Intent to Distribute (Count 2); (3) Possession of Fentanyl and ANPP with Intent to Distribute (Count 3); (4) Possession of Cocaine with Intent to Distribute (Count 4); (5) Use of Premises to Manufacture, Distribute, and Use a Controlled Substance (Count 5); and (6) Possession of Firearm in Furtherance of Drug Trafficking Crimes (Count 6). (Indictment, Nov. 29, 2022, ECF No. 57.) The Indictment also seeks forfeiture of all of Defendant's "right, title, and interest in any firearm and ammunition involved or

used in the commission of the offense, or found in the possession or under the immediate control of Defendant at the time of arrest including, but not limited to:

    a. one (1) 9mm Luger (9x19mm) caliber, Beretta BU9 Nano semi-automatic pistol, bearing serial number NU005314; and

    b. ammunition, namely, eight (8) 9mm Luger (9x19mm) caliber cartridges (5-Winchester, 3-Remington).

(*Id.* at 4–5.)

On March 3, 2023, Defendant filed an omnibus motion. (ECF No. 67.) The government submitted a response to Defendant's omnibus motion on March 31, 2023. (ECF No. 73.) On April 13, 2023, the undersigned heard oral argument on the omnibus motion. (Minute Entry for Proceeding, ECF No. 75.) The undersigned issued a decision on all the issues raised in Defendant's omnibus motion, except that he reserved on Defendant's motions to sever her co-defendant and to suppress statements. (Am. Omnibus Order, Oct. 16, 2023, ECF No. 99.)

On May 30, 2023, and June 15, 2023, the undersigned held evidentiary hearings regarding Defendant's motion to suppress statements, during which the undersigned heard testimony from witnesses and received exhibits into evidence. (Minute Entry of Proceedings, May 30, 2023, ECF No. 77; Minute Entry of Proceedings, June 15, 2023, ECF No. 79.) Thereafter, both parties submitted post-hearing submissions. (Def.'s Post-Hearing Submissions, Oct. 12, 2023, ECF No. 95; Gov't's Post-Hearing Mem. of Law, Oct. 13, 2023, ECF No. 97.)

After hearing oral argument, reviewing all motion papers, and presiding over

the evidentiary hearing, I recommend that the District Judge deny Defendant's motions to sever her co-defendant and suppress statements as contained in Defendant's omnibus motion (ECF No. 67) and deny Defendant's motion to suppress statements (ECF No. 95).[1]

## STANDARD OF LAW

On November 29, 2022, the Honorable Frank P. Geraci, Jr. referred this case to the undersigned to address, in relevant part, all pre-trial matters, including all pre-trial matters that a Magistrate Judge may hear and determine pursuant to 28 U.S.C. Section 636(b)(1)(A), and those which a Magistrate Judge may hear and thereafter file a report and recommendation for disposition pursuant to Section 636(b)(1)(B). (Text Order of Referral, Nov. 29, 2022, ECF No. 59.)

## DISCUSSION

For this Report and Recommendation, the Court has reviewed the following: Defendant's omnibus motion (ECF No. 67); the government's response in opposition (ECF No. 73); proffers made at oral argument held before the undersigned on April 13, 2023 (Minute Entry for Proceeding, ECF No. 75); testimony and exhibits provided during the evidentiary hearings held on May 30, 2023, and continued on June 15,

---

[1] In her omnibus motion Defendant sought to suppress statements made to "Government agents, including but not limited to any tapes or other electronic devices made by the Defendant." (Affidavit of James P. Vacca ¶ 84, Mar. 3, 2023, ECF No. 67.) Defendant did not include any specific statements that she sought to suppress in that motion. Thereafter, the government filed its opposition in which it included five exchanges between law enforcement and Defendant (Gov't's Resp. at 18–19, ECF No. 73.) At the close of the continued evidentiary hearing, the undersigned permitted both parties to submit post-hearing briefing on the issue of suppression of statements. (Text Order, Aug. 10, 2023, ECF No. 84.) Defendant filed her post-hearing briefing on CM/ECF as a "First Motion to Suppress Statements." (ECF No. 95.) Accordingly, while it appears that Defendant has moved twice to suppress statements, both motions were aimed at suppressing the statements identified by the government in its response to Defendant's omnibus motion (ECF No. 73).

2023 (Minute Entry of Proceedings, May 30, 2023, ECF No. 77); Minute Entry of Proceedings, June 15, 2023, ECF No. 79); Defendant's post-hearing submissions (ECF No. 95); and the government's post-hearing memorandum of law (ECF No. 97).

### *Findings of Fact Regarding Defendant's Motion to Sever Co-Defendant*

Defendant seeks severance under Federal Rules of Civil Procedure 8 and 14.[2] (Vacca Aff. ¶¶ 73–74.) She essentially alleges that she will suffer "spillover" prejudice that will severely prejudice her if she is tried with her co-defendant. (*Id.* at ¶ 74, ECF No. 67.) In support of this allegation, Defendant asserts in a conclusory fashion that Defendant's "lack of involvement will be masked by the vastly greater amounts of evidence against other defendants, and by the sheer number of defendants present in the courtroom.[3]" (*Id.*)

### *Conclusions of Law Regarding Defendant's Motion to Sever Co-Defendant*
### *Joinder Under Rule 8 was Proper*

Rule 8(b) provides for joinder of defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b) ("The defendants may be charged in one or more counts together or separately. All defendants need not be charged in each count.").

---

[2] Defendant also asserts that she is moving for severance under Rule 12(d)(5) of the Federal Rules of Criminal Procedure. However, no such subdivision exists under Rule 12.

[3] Defendant's argument that she will be prejudiced by the "sheer number of defendants present in the courtroom" is nonsensical as there is only one other defendant in this case.

Defendant has not provided any support for her argument that she was improperly joined. She merely indicates that she moves for severance under Rule 8 and states that "Rule 8(b) of the Federal Rules of Criminal Procedure allows for joinder of Defendants in the same indictment." (Vacca Aff. ¶ 76, ECF No. 67.) Defendant's conclusory statements are insufficient for the undersigned to find that joinder was improper in the first instance under Rule 8.

Moreover, the Indictment plainly alleges a conspiracy with both defendants named in the conspiracy count. (Indictment, ECF No. 57.) Thus, Defendant is properly joined pursuant to Fed. R. Crim. P. 8(b). *See United States v. Nerlinger,* 862 F.2d 967, 973 (2d Cir. 1988) (It is an "established rule . . . that a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed. R. Crim. P. 8(b).").

### *Severance is Not Warranted Under Rule 14*

Pursuant to Federal Rule of Criminal Procedure 14, "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). The decision to sever a trial pursuant to Rule 14 is "confided to the sound discretion of the trial court." *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003). A trial court's decision concerning severance is considered "virtually unreviewable," and the denial of such a motion "will not be reversed unless appellants

establish that the trial court abused its discretion." *United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991) (citation omitted).

"When defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *United States v. Astra Motor Cars*, 352 F. Supp. 2d 367, 369–70 (E.D.N.Y. 2005) (alteration omitted and quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)); *see also Cardascia*, 951 F.2d at 482 (in order to successfully challenge the denial of a request for severance, a defendant "must establish prejudice so great as to deny him a fair trial."); *United States v. Friedman*, 854 F.2d 535, 563 (2d Cir. 1988) ("[T]he defendant must show that he or she suffered prejudice so substantial as to amount to a 'miscarriage of justice.'" (quoting *United States v. Bari*, 750 F.2d 1169, 1177 (2d Cir. 1984)).

"[D]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States v. Chang An-Lo*, 851 F.2d 547, 557 (2d Cir. 1988) (citation omitted). "That the defendant would have had a better chance of acquittal at a separate trial does not constitute substantial prejudice." *United States v. Carson*, 702 F.2d 351, 366 (2d Cir. 1983).

There is a powerful presumption in favor of joint trials of defendants indicted together based upon the underlying policies of efficiency, avoiding inconsistent verdicts, providing a "more accurate assessment of relative culpability," avoiding

victims and witnesses having to testify repeatedly, and avoiding the random favoring of "the last-tried defendants who have the advantage of knowing the prosecutor's case beforehand." *Richardson v. Marsh*, 481 U.S. 200, 210 (1987) (citation omitted); *see also Cardascia*, 951 F.2d at 482 ("The deference given by an appellate court to a trial court's severance decision reflects the policy favoring joinder of trials, especially when the underlying crime involves a common plan or scheme and defendants have been jointly indicted."). The Second Circuit has instructed that "[c]onsiderations of efficiency and consistency militate in favor of trying jointly defendants who were indicted together. . . ." *United States v. Spinelli*, 352 F.3d 48, 55 (2d Cir. 2003) (citations omitted); *see also United States v. Van Sichem*, No. SS 89 CR. 813 (KMW), 1990 WL 41746, at *1 (S.D.N.Y. Apr. 2, 1990) ("There is a strong presumption in favor of joint trials for jointly indicted defendants, particularly where, as here, the 'crimes charged involve a common scheme or plan.'") (alteration omitted and quoting *United States v. Girard*, 601 F.2d 69, 72 (2d Cir. 1979)).

Here, even if Defendant had a minimal role in the alleged conspiracy and criminal activity, severance would not be warranted. Again, as indicated above, joint trials are favored for a myriad of reasons implicated in this case, for example, the interests of judicial economy, avoiding inconsistent outcomes, and avoiding duplication of witness testimony. Further, differing levels of proof and culpability do not justify separate trials. This is particularly the case where a conspiracy is alleged. *See Spinelli*, 352 F.3d at 55 ("Joint trials are often particularly appropriate in

circumstances where the defendants are charged with participating in the same criminal conspiracy, as is the case here.").

Moreover, Defendant's motion contains only conclusory allegations that she will suffer "spillover" prejudice if tried with her co-defendant, which is insufficient to warrant severance.[4] Where "spillover evidence is alleged as a ground for a Rule 14 severance, the defendant's burden to demonstrate substantial prejudice resulting in an unfair trial is heavy." *United States v. Carmichael*, No. 14-CR-6136 (FPG), 2016 WL 9273619, at *5 (W.D.N.Y. Mar. 11, 2016) (internal quotations and citation omitted).

Defendant has not met the heavy burden of proving that she will suffer spillover prejudice if her case is not severed from that of her co-defendant. As in any case with a conspiracy involving more than one defendant who played varying roles in the conspiracy, Defendant might suffer some prejudice by sitting before a jury while the government introduces evidence unrelated to her alleged conduct. But, it is "not enough to demonstrate that separate trials would have increased the chances of [her] acquittal; rather, the appellant must show prejudice so severe as to amount to a denial of a constitutionally fair trial." *Spinelli*, 352 F.3d at 54–55 (internal quotation and citations omitted); *see also United States v. Miller*, 116 F.3d 641, 679 (2d Cir.

---

[4] Defendant's argument in support of severance is set forth in an affirmation from her counsel made under penalty of perjury (ECF No. 67). However, Defendant's counsel makes no effort to identify any personal knowledge that he has concerning his client's purported involvement in the alleged criminal conduct. Thus, not only is the submission of an affirmation of this nature under penalty of perjury likely inappropriate, but it amounts to nothing more than argument and conclusory assertions.

1997) (noting that spillover prejudice may be remedied through clear judicial instructions).

In short, Defendant's arguments for severance—which center on "guilt by association" and "spillover prejudice"—do not satisfy the heavy burden to prove substantial prejudice. Accordingly, the undersigned recommends that the District Judge deny Defendant's motion for severance.

### Findings of Fact Regarding Defendant's Motion to Suppress Statements

In her omnibus motion, Defendant moved, in relevant part, to suppress "certain statements [that] may have been made by [ ] Defendant at the time and place of [her] arrest and such statements may be used against Defendant during the course of the trial and as such, those statements were taken from [ ] Defendant in violation of [her] State and Federal Constitutional Rights [sic] against self-incrimination and against [her] *Miranda*[5] rights." (Vacca Aff. ¶ 83, ECF No. 67.) Defendant did not articulate what statements she sought to challenge in her omnibus motion.

In response, the government indicated that it intended to use the following statements made to law enforcement:

1. On October 21, 2021, at approximately 6:42 AM and at 6:55 AM, at 277 Wilkins Street, Rochester, New York, the defendant acknowledged that she had pants in the room and acknowledged which room and that she had turquois pajama pants when asked the type and color of pants she had in the

---

[5] Referring to *Miranda v. Arizona,* 384 U.S. 436 (1966).

other room. This exchange can be seen on Rochester Police Department Body Worn Camera imagery of Officer Bennetti and Officer Jonathan Kent.

2. On October 21, 2021, at approximately 7:06 AM, at 277 Wilkins Street, Rochester, New York, the defendant acknowledged that an item of clothing offered by a police officer would be acceptable for her to wear. This exchange can be seen on Rochester Police Department Body Worn Camera imagery of Officer McClellen.

3. On October 21, 2021, at approximately 7:31 AM, at 277 Wilkins Street, Rochester, New York, the defendant acknowledged that she had a pair of shoes in a nearby room when asked by an officer about shoes. She acknowledged that flipflops would be alright when asked. This exchange can be seen on Rochester Police Department Body Worn Camera imagery of Officer Allen and Officer Benetti.

4. On October 21, 2021, at approximately 7:27 AM, at 277 Wilkins Street, Rochester, New York, the defendant acknowledged to Rochester Police Investigator Ryan Beyea that the BMW parked in the driveway belonged to her and she provided authorization to search the vehicle to officers. Part of this exchange can be overheard on Rochester Police Department Body Worn Camera imagery of Officer Allen.

5. On October 21, 2021, at approximately 9:00 AM, at the Public Safety Building, 185 Exchange Street, Rochester, New York, the defendant told an officer she resided at 273 Collinwood Drive and that her telephone number was

(provided her phone number). The exchange can be seen on Rochester Police Department video imagery from the interview room.

(Gov't's Resp. at 19, ECF No. 73.)[6]

The government indicates that law enforcement is required to provide an individual with a *Miranda* warning where that individual is subject to interrogation. (*Id.*) It provides that the word "interrogation" applies to both direct questioning and "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Id.*) It appears that the government is arguing that suppression is not warranted here because law enforcement would not have known that the questions they asked Defendant in connection with the above statements would have elicited any incriminating response.

During the evidentiary hearing held on May 30, 2023, Rochester Police Officer Matthew Bennetti testified that he was present on October 21, 2021, at 277 Wilkins Street when law enforcement executed a search warrant at that location. (Tr. at 8:4–9:1, ECF No. 85.) The government played portions of Officer Bennetti's body worn

---

[6] During oral argument held on May 30, 2023, the government affirmatively stated that it did not intend to offer the exchanges referenced in paragraphs 4 and 5 above. (Tr. at 2:19–20:18, May 30, 2023, ECF No. 85.) Defense counsel agreed that these two statements did not need to be addressed at the evidentiary hearing. (*Id.* at 3:20–23.) The parties agreed, however, that to the extent any testimony was elicited contrary to the parties' joint understanding, that it could be offered for impeachment or rebuttal purposes. (*Id.* at 3:24–4:6.)

camera footage from that day for the Court (Gov't's Exhibit 2[7]). Officer Bennetti testified that one of his responsibilities on that date "was just to stand by with the people that were detained inside the house while the search teams started the search of the search warrant." (*Id.* at 11:6–10.) He further testified as follows:

> So basically all that is, is myself and other uniformed officers, we will go into the location and we will stand by and watch over the individuals that are in the house so the search teams can concentrate on searching the location. You know, we deal with, like, if an individual's got to use the bathroom or if they are cold or they need something, we try to do the best to accommodate their needs so that the search team just concentrates on their role in the search warrant which is obviously searching the location.

(*Id.* at 8:11–21.)

When asked if he remembered how Defendant was clothed on that day, Officer Bennetti testified "[i]f I remember correctly, she did not have anything, any underwear on upon entry which is why, I believe, you have her with a blanket over her." (*Id.* at 23:9–13.) He also testified that Defendant was handcuffed, sitting on a couch, and considered to be detained and not free to leave. (*Id.* at 22:19–22; 23:14–16; 28:4–18.) The government asked Officer Bennetti about an exchange initiated by Officer John Kent that could be heard on Officer Bennetti's body worn camera footage

---

[7] Government's Exhibit 2 is an external thumb drive containing separate folders with files of body worn camera footage for Rochester Police Officers Bennetti, John Kent, Mark Allen, and retired Officer Herbert McClellan from the date in question. For Officer Bennetti, the government played segments of videos 1 and 3 contained in his folder on that thumb drive. The government played segments of videos 1 and 2 contained in Officer Kent's folder. With respect to Officer Allen, the government played a portion of video 4 contained in his folder. Finally, the government played a segment of video 3 contained in Officer McClellan's folder.

and Officer Bennetti explained that Officer Kent was asking Defendant "if she had any pants." (*Id.* at 22:24–23:5; 28:24–29:11.)

The government then asked Officer Bennetti about a later exchange and Officer Bennetti testified "[t]hat is where we were trying to find footwear for [Defendant] to wear." (*Id.* at 68:8–16.) Officer Bennetti testified that in that exchange, Officer Mark Allen asked Defendant something to the effect of "are those your sandals okay or are these your sandals." (*Id.* at 29:24–30:14.) When asked why they were trying to find footwear, Officer Bennetti stated "[b]ecause she's going to be transported to our headquarters and she did not have anything on her feet." (*Id.* at 24:17–19.) Officer Benetti transported Defendant from 277 Wilkins Street to the Public Safety Building. (*Id.* at 13:3–12; Gov't's Post-Hearing Mem. of Law at 4–5, Oct. 13, 2023, ECF No. 97.)

The government then asked Officer Bennetti "[h]ave you done that in the past with other individuals that didn't have clothing on or were not fully clothed when they were being transported from the location" and if, so, why, to which Officer Bennetti responded:

> Because it's the right thing to do. If somebody's leaving their location and it's - - the weather's bad outside or it's cold, I don't want them outside in a T shirt and shorts if they have pants or a coat to put on. We try to do our best to make sure they're comfortable leaving. And, obviously, no matter what, we want them to have shoes on because if they step on something or hurt themselves, we own that because they're in our custody at that point. So we do everything we can to make sure they get footwear or appropriate clothing for the elements that they're going to go outside in.

(*Id.* at 25:4–19.)

Officer Bennetti further testified that Defendant did not receive *Miranda* warnings from the time law enforcement was at 277 Wilkins Street to the time her transport to headquarters was completed. (*Id.* at 26:19–27:2.)

The government also called Rochester Police Officer John Kent as a witness. Officer Kent testified that he was also tasked with watching Defendant and her co-defendant while law enforcement searched 277 Wilkins Street. (*Id.* at 33:23–34:14.) The government asked Officer Kent about an exchange he initiated with Defendant regarding her clothing as depicted in his body worn camera footage and Officer Kent testified that Defendant "didn't have any pants on underneath that blanket and I was asking her if she had a pair of pants to put on somewhere." (*Id.* at 42:24–43:8; 46:14–47:1.) When asked why he posed this question to Defendant, Officer Kent responded "[t]ypically we have to get them dressed in order to transport them somewhere or take them anywhere. So I was asking if there was some clothing she could put on so we're not walking her outside in her underwear." (*Id.* at 43:9–13.) Officer Kent confirmed that Defendant was in handcuffs at the time this exchange occurred, that she was not free to leave, and that she had not been issued her *Miranda* warnings. (*Id.* at 43:14–17; 44:3–4; 47:2–15.)

Officer Kent also testified about another exchange he initiated with Defendant where he "was asking her what kind of pants to grab her or where the pants would be to get her dressed." (*Id.* at 45:11–24; 46:14–47:1.) When questioned why he would ask Defendant that question, Officer Kent testified:

> Again, because in order to take them anywhere, transport them, they
> would need to be -- we would put pants on her. We would put clothes on

her. At that point I also believe a female was on their way to do a search
of her and typically, that's when females are dressed.

(*Id.* at 45:25–46:5.)

Defense counsel asked whether Officer Kent had ever arrested individuals who were not wearing pants but rather had a blanket on them and he responded "I believe so, yes." (*Id.* at 47:16–48:1.) The government then questioned why law enforcement did not "just use the blanket to transport her, to cover her?" and whether there was some type of analysis involved in that decision. (*Id.* at 48:12–31.) In response Officer Kent testified "[n]o, it was -- it's just a large blanket. I mean, typically we get people dressed allow them to put clothes on before we take them out of a location." (*Id.* at 48:14–16.) When asked why that was he responded "[b]ecause we're not going to parade people down the street in their underwear or, you know, wrapped in a blanket. We're going to try to provide them with clothing if we're going to take them from the location." (*Id.* at 48:18–21.)

The government also called Rochester Police Officer Mark Allen as a witness. Officer Allen testified that on the date of the incident in question Defendant was in handcuffs, not free to leave, and that "[t]o the best of his knowledge" Defendant did not receive any *Miranda* warnings. The government played a portion of Officer Allen's body worn camera footage captured on October 21, 2021, at 277 Wilkins Street in which Officer Allen's voice can be heard asking about "shoes" and questioned Officer Allen about that exchange (*Id.* at 55:3–10; 60:15–61:17.) Officer Allen testified that he "saw a woman being escorted out of the kitchen didn't have any shoes on and I asked if she wanted shoes . . . [because he] was under the impression she was going

to be leaving the location and I didn't want her to walk outside without any shoes on." (*Id*. at 61:22–62:2.)

The government called its fourth and final witness, retired Rochester Police Officer Herbert McClellan, at the continued evidentiary hearing held on June 15, 2023. Officer McClellan testified that he was present on October 21, 2021, at the Wilkins Street location and tasked with "just being with the people that were in custody while the narcotics officers did the search of the house." (*Id*. at 74:21–25; 75:12–19; 76:14–77:3.) Officer McClellan further testified that his body worn camera footage depicted Officer Bennetti and Investigator Ryan Beyea "getting [Defendant's] clothing because she's getting ready to be transported to the Public Safety Building." (*Id*. at 85:2–18.)

In her post-hearing briefing, Defendant argues that any statements she made should be suppressed because the testimony provided by the Rochester police officers during the evidentiary hearing demonstrates that they elicited her statements, she was in custody at the time she made them, and she did not receive her *Miranda* warnings. (Def.'s Post-Hearing Submissions at 2, Oct. 12, 2023, ECF No. 95.) She contends that since she was handcuffed and detained at the time she made the statements, those statements were not voluntary. (*Id*. at 5.)

In its post-hearing submission, the government contends that *Miranda* does not apply simply where someone is in custody, but rather it applies if that individual is subject to custodial interrogation. (Gov't's Post-Hearing Mem. of Law at 6.)  It

further contends that Defendant was not subject to interrogation during the exchange in question.

The government argues that law enforcement could not have known that its questions regarding Defendant's clothing would elicit any incriminating response based upon four facts as follows: (1) Defendant was detained and was going to be removed from 277 Wilkins Street upon conclusion of the search; (2) Defendant was not properly clothed for transport; (3) she needed proper clothing to be transported to the Public Safety Building; and (4) the officers who asked Defendant the questions regarding her clothing testified that they asked about her clothing because she was going to be transported. (*Id*. at 8.)

### Legal Conclusions Regarding Defendant's Motion to Suppress Statements

In *Miranda* the Supreme Court held that to protect a defendant's rights against compulsory self-incrimination under the Fifth and Fourteenth Amendments, certain safeguards must apply in the context of custodial interrogations. *Id*. at 444. The Supreme Court has further provided that the safeguards promulgated in *Miranda* apply when "a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis,* 446 U.S. 291, 300–01 (1980). In other words, "the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. at 301.

Importantly, the Supreme Court clarified in *Innis* that "since the police . . . cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response." *Id.* at 301–02. Whether the police should have known that their words or actions were reasonably likely to elicit an incriminating response is determined by examining "the totality of the circumstances." *United States v. Broughton*, 600 F. App'x 780, 783 (2d Cir. 2015) (summary order).

Here, the parties do not dispute Defendant was detained at the time she made the statements in question. Rather, the parties disagree about whether Defendant's statements were elicited via interrogation by law enforcement and, concomitantly, whether Defendant should have been provided with *Miranda* warnings prior to making the statements. Upon reviewing the statements, listening to the testimony provided by the officers who were present at 277 Wilkins Street, who either took part in or witnessed the exchanges challenged by Defendant, and considering the applicable law the Court finds that suppression is warranted.

It is undisputed that Defendant was not wearing pants when she was sitting on the couch in handcuffs during the execution of the search warrant. She was using a blanket to cover herself. It is also undisputed that she was not wearing shoes at this time. It is further undisputed that law enforcement was going to transport Defendant to the Public Safety Building from 277 Wilkins Street.

Officer Kent testified that he asked Defendant "if she had a pair of pants to put on somewhere" because she would need to be wearing pants for law enforcement to transport her. He testified that he wanted to ensure that she was dressed and not "walking [ ] outside in her underwear." Similarly, Officer Allen testified that he asked Plaintiff about shoes because he "didn't want her to walk outside without any shoes on." Officer Bennetti overheard this exchange and testified that they were looking for shoes for Defendant because "she's going to be transported to our headquarters and she did not have anything on her feet."

It is clear to the undersigned that, based upon this testimony, the officers never intended to obtain evidence to use against Defendant when asking the above questions. However, the case law is clear that an interrogation encompasses any words or actions on the part of law enforcement that are "reasonably likely to elicit an incriminating response." *Innis*, 446 U.S. at 301–02. The officers' intent when posing the questions is not the test. Asking Defendant if she had a pair of pants and about her shoes while she was handcuffed in a drug house actively being searched by law enforcement ties Defendant to that drug house. In other words, the questions elicited an incriminating response and it is reasonably likely that asking someone if her belongings were present in the drug house would solidify the nexus between the defendant and the drug house.

The undersigned grappled with this conclusion because the questions the officers posed to Defendant seem innocuous and, based on the officers' testimony,

were meant to ensure that she was properly clothed to be transported to the Public Safety Building. Nevertheless, the undersigned is bound by the law.

Based upon the forgoing, and in considering the totality of the circumstances, the undersigned finds that the officers subjected Defendant to words that they should have known were reasonably likely to elicit incriminating responses from her. For this reason, the undersigned recommends that the District Judge grant Defendant's omnibus motion to the extent it seeks suppression of Defendant's statements (ECF No. 67) and, further, grant Defendant's motion to suppress statements (ECF No. 95).[8]

## CONCLUSION

Based on the foregoing, I recommend that the District Judge grant Defendant's motions to sever the co-defendant and suppress statements as contained in Defendant's omnibus motion (ECF No. 67) and grant Defendant's motion to suppress statements (ECF No. 95). Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[7]

---

[8] The undersigned previously addressed a motion to suppress statements made by Defendant's co-defendant, Rondell Johnson. (ECF No. 78.) Mr. Johnson sought to suppress several statements, including those related to the whereabouts of his jacket and shoes. The undersigned recommended to the District Judge that he grant Defendant's motion to suppress the statements largely because the government only stated the applicable law and offered conclusory assertions as to why the Court should not suppress certain statements without explaining how the law applied to the specific statements at issue. Further, no evidentiary hearing was held and, therefore, the officers involved in the relevant exchanges with Mr. Johnson did not provide context for the questions as they did here.

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

DATED:     November 13, 2023
                Rochester, New York

_____
MARK W. PEDERSEN
United States Magistrate Judge